UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHNNY C., | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:22-cv-30111-KAR |
| | ) |
| MARTIN O'MALLEY, Commissioner | ) |
| Social Security Administration,[1] | ) |
| | ) |
|    Defendant. | ) |

<u>MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION TO
AFFIRM THE COMMISSIONER'S DECISION</u>
(Dkt. Nos. 13 & 19)

ROBERTSON, U.S.M.J.

    I.      INTRODUCTION AND PROCEDURAL HISTORY

      Johnny C. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review

of a final decision of the Commissioner denying his application for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI").  Plaintiff applied for DIB on July 8, 2016

and SSI on May 5, 2017 alleging a December 15, 2015 onset of disability due to post-traumatic

stress disorder ("PTSD"), deep depression, anxiety, insomnia, obsessive compulsive disorder

("OCD"), and bipolar disorder (Administrative Record "A.R." at 67-68, 187, 191, 621).[2]  His

applications were denied initially (A.R. at 113-18) and on reconsideration (A.R. at 125-30).  He

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Martin O'Malley, Commissioner of the Social Security
Administration, is substituted for Kilolo Kijakazi, former Acting Commissioner of the Social
Security Administration.

[2] All citations to "A.R." refer to the administrative record, which appears on the docket of this
case as docket number 8.  The page numbers were assigned by the Social Security
Administration ("SSA") and appear in the lower right-hand corner of each page.

requested a hearing before an Administrative Law Judge ("ALJ"), and one was held on May 1, 2018 (A.R. at 30-66). On August 30, 2018, the ALJ issued an unfavorable decision on Plaintiff's claim (A.R. at 9-29). The Appeals Council denied review (A.R. at 1-5). Upon this court's review of the ALJ's decision, judgment was entered for Plaintiff and the matter was remanded to the ALJ under sentence four of § 405(g) (A.R. at 667-92). A second administrative hearing was held on July 20, 2021 (A.R. at 604-55), and the ALJ issued an unfavorable decision on Plaintiff's claim on November 29, 2021 (A.R. at 572-97). The Appeals Counsel denied review on June 29, 2022 (A.R. at 517-23), and, thus, Plaintiff is entitled to judicial review.

Plaintiff seeks either a judicial award of benefits or remand based on his contentions that the ALJ failed to assign proper weight to certain medical opinions, made an erroneous credibility determination concerning the severity of Plaintiff's symptoms, and failed to reconcile conflicts between the testimony of the Vocational Expert ("V.E.") and the *Dictionary of Occupational Titles* ("DOT"). Before the court are Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 13) and the Commissioner's motion to affirm the decision (Dkt. No. 19). The parties have consented to this court's jurisdiction (Dkt. No. 10). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons set forth below, the court DENIES Plaintiff's motion and GRANTS the Commissioner's motion.

II.    LEGAL STANDARDS FOR ENTITLEMENT TO DIB AND SSI

A claimant is disabled under the Act if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when he

is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The ALJ evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v).[3]  The hearing officer must determine whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the ALJ must assess the claimant's Residual Functional Capacity ("RFC"), which he or she uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may

---

[3] The Social Security Administration ("SSA") has promulgated identical sets of regulations governing eligibility for DIB and SSI.  *See McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, the court cites to the DIB (Title II) regulations only.  *See id.*

cause physical or mental limitations or restrictions that may affect his or her
capacity to do work-related physical and mental activities.

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the
burden to demonstrate his RFC. *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013
WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806
(8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs
in the national economy that the claimant can perform notwithstanding his restrictions and
limitations.  *See Goodermote*, 690 F.2d at 7.

Evaluation of a claim of mental impairment depends on an assessment of the degree of a
claimant's limitations in four broad, work-related functional areas, known as the Paragraph B
criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3)
concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  *See* 20
C.F.R. § 404.1520a(c)(3).  In rating the degree of functional limitation in those areas, the ALJ
uses a five point scale of none, mild, moderate, marked, and extreme.  *See* 20 C.F.R. §
404.1520a(c)(4).  A limitation is "marked" if the claimant's functioning "independently,
appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R. Pt. 404,
Subpt. P, App'x 1, § 12.00(F)(2)(d).  An extreme limitation in an area is incompatible with the
ability to perform substantial gainful activity.  *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, §
12.00(F)(2)(e).

III.    RELEVANT FACTUAL BACKGROUND[4]

---

[4] Because Plaintiff only challenges the ALJ's evaluation of his mental impairments, the court
limits its discussion of the evidence accordingly.

A.      Education, Work, and Personal History

Plaintiff was forty-one years old on the alleged onset date (A.R. at 67, 621).  He obtained

a GED (A.R. at 51).  He had worked unloading trucks and stocking store shelves (A.R. at 628).

Between 2006 and 2015, he worked as a delivery driver for a bulk mailing business and as a

cook (A.R. at 210).  In 2015, he left his job as a cook in a local restaurant to travel to California

to be with his mother who had undergone surgery (A.R. at 205-06, 396).  He claimed that his

mental health condition, including intermittent explosive disorder, prevented him from working

thereafter (A.R. at 630-31).

B.      Medical Records

On March 20, 2016, Plaintiff presented at the Berkshire Medical Center Emergency

Department reporting that he was drinking pretty regularly and heavily after he attended his best

friend's funeral in California (A.R. at 365).  He was diagnosed with depression and advised to

follow up with the Brien Center for treatment (A.R. at 365-66, 370).

On April 5, 2016, LICSW Nancy Banfield of the Brien Center conducted a

comprehensive assessment of Plaintiff (A.R. at 300-13).  Ms. Banfield described Plaintiff's

ordered thoughts, clear and logical speech, and adequate judgment (A.R. at 308).  Plaintiff

reported that he was depressed, numb, sad, and tearful.  His mental status exam, including his

behavior, speech, perception, thought content, thought process, cognitive functioning,

orientation, memory, and insight were within normal limits (A.R. at 304-05).  Ms. Banfield

diagnosed him with PTSD (A.R. at 310).

The April 29, 2016 Brien Center record shows that Plaintiff was anxious and depressed

(A.R. at 442).  He reported sudden nightmares, intrusive thoughts, and symptoms related to

hyperarousal (A.R. at 443).  He was diagnosed with PTSD, unspecified depressive disorder, rule

out unspecified bipolar disorder, and alcohol, cocaine and cannabis use disorders in remission (A.R. 443). PA-C Christopher Biernacki prescribed melatonin and Diphenhist for sleep and Prozac and Lexapro for depression and anxiety (A.R. at 439, 443).

On June 8, 2016, Plaintiff's PCP, Benjamin Rudin, M.D., of CHP Adams Internists ("CHP"), noted that Plaintiff displayed a normal mood and affect and good judgment (A.R. at 496, 498).

On June 15, 2016, Mr. Biernacki described Plaintiff's mood as dysphoric and his affect as blunted (A.R. at 324). Otherwise, his mental status examination was within normal limits (A.R. at 324). During Plaintiff's July 13 and 22, 2016 visits to the Brien Center, he reported that medications, including Lexapro and Risperdal, which replaced Prozac, had improved his sleep and mood. He was angry and irritable at times (A.R. at 446). During the July 22, 2016 visit, Mr. Biernacki noted that Plaintiff's mental status exam was within normal limits except that his mood was dysphoric, his affect was blunted, and his thought process was tangential (A.R. at 321).

The August 16, 2016 Brien Center record included Plaintiff's report that he was going to California the next day because his mother, who had breast cancer, was experiencing complications. Plaintiff indicated that he was still angry and irritable at times, but Risperdal helped. He reported recently retrieving a hatchet from his home when he felt threatened by three men on the street (A.R. at 446).

During Plaintiff's September 30, 2016 visit to the Brien Center, he reported that he had stopped taking Lexapro and Risperdal due to their negative side effects. He was more worried about anger and being out of control than about depression. On November 18, 2016, Plaintiff indicated that he was taking Trileptal and his anger was under control. He had been isolating at

home, had not argued with his girlfriend, had acquired two new puppies, but had experienced crying spells (A.R. at 446).

On January 13, 2017, Plaintiff reported to Mr. Biernacki that Remeron (mirtazapine) improved his sleep and mood. On February 10, 2017, Plaintiff indicated that he continued to use cannabis, his sleep and mood had improved, and his anger was under control. The Brien Center record of March 31, 2017 indicates that Plaintiff's brother died in February. Plaintiff reported that he remained able to control his anger (A.R. at 446).

The April 10, 2017 record of Plaintiff's visit to his PCP indicates that Plaintiff had recently started taking Abilify, and that, while Trileptal helped his anger, he stopped taking it because it left him feeling emotionless, and he was no longer using Remeron (A.R. at 491, 493).

The April 28, 2017 Brien Center record described Plaintiff's account of a recent outburst he directed toward a police officer during a traffic stop. He said deep breathing helped him avoid physical violence. During Plaintiff's June 2, 2017 Brien Center visit, he reported that he lacked energy and motivation and was not taking Abilify daily as prescribed (A.R. at 446).

During Plaintiff's July 19, 2017 visit to the Brien Center, Plaintiff reported the recent deaths of his girlfriend's father, his cousin, and a friend. He was taking Abilify daily, which made angry outbursts less frequent, although he had blown up at his girlfriend's sister a day earlier. He was taking Trileptal and sleep medication three to four times per week (A.R. at 446). Mr. Biernacki described Plaintiff's mood as dysphoric, his affect as flat, and his thought process as tangential (A.R. at 446). Mr. Biernacki's impression was that Plaintiff suffered from PTSD due to childhood physical abuse by his older brother and intermittent explosive disorder (A.R. at 447).

During Plaintiff's December 18, 2017 visit to CHP, he complained of anxiety, but reported an improvement in his mood swings (A.R. at 485, 487, 488).  He was active, alert, and oriented with a normal mood and affect (A.R. at 488).  Although Plaintiff was satisfied with his Brien Center therapist, he expressed continued dissatisfaction with Mr. Biernacki's prescribing (A.R. at 487, 488).

Plaintiff's mood and affect were normal during his March 23, 2018 visit to the Berkshire Medical Center Emergency Department for a severe headache (A.R. at 475, 476).  He reported continuing anxiety and insomnia during his April 25, 2018 visit to Dr. Rudin (A.R. at 998). Plaintiff told Dr. Rudin that he stopped taking Abilify and Remeron due to concerns about his abnormal liver function tests, but on June 18, 2018, he reported that he had resumed the medication (A.R. at 992, 995, 998).

During Plaintiff's July 20, 2018 Brien Center visit, he described low energy and motivation and reported that his friend moved into his apartment following the friend's father's death.  He stopped taking his prescribed medications to avoid gaining more weight, but his weight did not change (A.R. at 934).

The note of Plaintiff's July 24, 2018 visit to CHP states that Plaintiff did not notify Mr. Biernacki that he had discontinued his psychiatric medications (A.R. at 991).  Plaintiff reported that the Xanax he purchased on the street increased his ability to function (A.R. at 991). Plaintiff's August 9, 2018 CHP treatment record indicates that he was active and alert, his mood, affect, and recent and remote memory were normal, and his judgment was good (A.R. at 988).

During Plaintiff's September 19, 2018 Brien Center visit, he reported that his uncle recently died (A.R. at 934).  On October 23, 2018, Plaintiff reported to Dr. Rudin that he was generally noncompliant with his prescribed psychiatric medications (A.R. at 982, 984).

8

On November 14, 2018 at the Brien Center, Plaintiff reported hitting his girlfriend's sister after she struck him with a lamp.  His girlfriend's sister called the police, but they did not arrest Plaintiff.  Plaintiff stated that he had not seen his therapist, Nancy Apkin, in three or four months (A.R. at 934).  During Plaintiff's December 11, 2018 visit to CHP, he reported that he was more compliant with his psychiatric medication (A.R. at 979, 981).

On January 9, 2019, Plaintiff told Mr. Biernacki that his mood was fine, he was sleeping well when using melatonin and Diphenhist, and had returned to therapy (A.R. at 934).

On January 13, 2019, Plaintiff presented at the Berkshire Medical Center Emergency Department with a mild concussion (A.R. at 1027, 1029).  Plaintiff sustained the injury when he became acutely agitated during an argument with his girlfriend and repeatedly smashed his head on a steel column (A.R. at 1027).

On February 13, 2019, Plaintiff told Dr. Rudin that he felt a little worse emotionally after he stopped taking regular doses of his prescribed medications because he was concerned about their side effects (A.R. at 975, 977).  Plaintiff reported a normal mood during his April 15, 2019 visit to CHP (A.R. at 971, 974).  During Plaintiff's June 19, 2019 Brien Center visit, he described his mood as up and down (A.R. at 934).  He was mostly compliant with his medication, but sometimes forgot (A.R. at 934).

During Plaintiff's June 26, 2019 visit to CHP, he displayed good judgment and normal mood, affect, and memory, but reported feeling detached and lacking energy and motivation (A.R. at 964, 966).  He said he had not told Mr. Biernacki that he had discontinued his psychiatric medications and he had not seen his therapist in three months (A.R. at 966).  During his August 5, 2019 CHP visit, Plaintiff reported that he was not taking his medications every day (A.R. at 961).

On September 18, 2019, Plaintiff told Mr. Biernacki that he was busy renovating his girlfriend's home in Adams and was moving there.  He reported taking his medication daily but was not sure his mood had improved (A.R. at 934).  He had not visited his therapist recently (A.R. at 934).

During Plaintiff's January 3, 2020 Brien Center visit, he reported that he was compliant with his medication.  He was sleeping well, and his anger was under control, but he continued to feel depressed at times, lacked energy and motivation, was anxious around people, and experienced memory lapses (A.R. at 934).  Mr. Biernacki described Plaintiff's mood as dysphoric and his affect as flat.  Otherwise, his mental status exam was within normal limits (A.R. at 934-35).  Mr. Biernacki continued Plaintiff's medications, Remeron, Abilify, Diphenhist, and melatonin (A.R. at 936).  During tele-visits with Mr. Biernacki on March 25 and June 17, 2020, Plaintiff reported that he was compliant with his medications but was angry and more anxious (A.R. at 937).  On June 17, 2020, Plaintiff told Dr. Rudin that he recently restarted his prescribed medications because his anxiety and irritability increased when he discontinued them (A.R. at 954, 956).

During Plaintiff's August 19, 2020 Brien Center tele-visit, he stated that his mood had improved but he avoided people.  He described having a conflict with a person in a parking lot and walking away without losing control (A.R. at 937).

During Plaintiff's October 21, 2020 visit to CHP, he reported being super mad and was agitated (A.R. at 950, 952, 953).  He had discontinued treatment at the Brien Center because the medications they prescribed made him feel like a zombie (A.R. at 952).  Dr. Rudin prescribed a limited amount of lorazepam and referred Plaintiff to Leslie Fishbein, M.D., for psychiatric treatment (A.R. at 953).

Dr. Fishbein treated Plaintiff once via a tele-visit on November 19, 2020 (A.R. at 944, 947). Plaintiff reported that he had a roommate but stayed with his girlfriend. He left high school because he did not like being told what to do (A.R. at 947). Plaintiff described having violent fantasies during a confrontation with another driver. Plaintiff drove away but continued to ruminate about the encounter and fantasize about getting revenge (A.R. at 946). Dr. Fishbein noted that Plaintiff was cooperative. His thought processes were logical and goal directed and his thought content was normal. His mood and affect were depressed. He appeared to have above average intelligence and adequate insight and judgment. Dr. Fishbein diagnosed chronic PTSD and intermittent explosive disorder. She prescribed gabapentin and a low dose of lorazepam as needed (A.R. at 947). On December 16, 2020, Plaintiff told Dr. Rudin that the gabapentin helped him control angry thoughts (A.R. at 941, 943). He was continuing therapy with Ms. Apkin at the Brien Center (A.R. at 943).

During Plaintiff's February 24, 2021 Brien Center visit, he reported cycles of insomnia and hypersomnia and persistent hypervigilance. He drove his girlfriend's aunt to Springfield to buy a car (A.R. at 937). During Plaintiff's March 31, 2021 tele-visit with Mr. Biernacki, Plaintiff's mood was anxious, but his mental status exam was otherwise within normal limits (A.R. at 937-38). Plaintiff reported that he did not leave the house often because he wanted to avoid people (A.R. at 937). Mr. Biernacki continued Plaintiff's medications (Abilify, Diphenhist, melatonin, and Remeron) (A.R. at 939).

    C.    <u>Opinion Evidence</u>

        1.    Examining Consultant Teena Guenther, Ph.D.

Teena Guenther conducted a consultative examination of Plaintiff on November 16, 2016 (A.R. at 395-408).[5]  Dr. Guenther noted that Plaintiff initially presented as almost overly reserved, but as the interview continued, he became more passionate as he spoke about certain events and situations in his life, acknowledging that he struggled with anger.  Toward the end of the interview, Plaintiff's voice became louder and he often cursed, but he was otherwise respectful (A.R. at 395).

Plaintiff reported that his brother abused him when he was a child (A.R. at 404).  He left his most recent job as a cook in a local restaurant to go to California to be with his mother who had undergone a mastectomy.  He did not return to work due to underlying symptoms and struggles with anger (A.R. at 396).  Plaintiff described himself as quick-tempered if he felt threatened or disrespected (A.R. at 396, 400).  He reported episodes of anger, including a recent incident when he displayed a hatchet to threaten an individual who he thought was ridiculing him (A.R. at 396, 400, 404).  He said that the week before the examination, the police responded after he banged on his neighbors' door because they left two notes on his car asking him not to park in a certain space (A.R. at 400, 402, 404).  He further said that he had disagreed with co-workers who said stupid stuff (A.R. at 396).  He indicated that he had threatened co-workers and walked off a job if he felt frustrated or angry (A.R. at 396, 400).

Plaintiff reported difficulty with concentration and memory (A.R. at 402).  Dr. Guenther found that Plaintiff was circumstantial, vague, and difficult to follow when he responded to questions, which made it challenging for her to get precise information (A.R. at 395, 396, 404). He was able to perform simple calculations and serial threes, spell "world" in reverse, recite six

---

[5] Pages 397, 399, 401, 403, 405, and 407 of Dr. Guenther's report as scanned for the administrative record are blank.

digits forward and four digits backward, and recall three objects immediately and after five minutes (A.R. at 404). Plaintiff said that he received psychiatric treatment at the Brien Center. Nancy Adkin was his therapist and Mr. Biernacki had prescribed Trileptal to control his anger. He had been taking that medication for about a month. Plaintiff believed that it offered some benefit, but he continued to experience underlying anger (A.R. at 398).

Based on Plaintiff's descriptions of his struggles to manage anger, Dr. Guenther had significant concerns about his judgment (A.R. at 404). She noted that small situations had provoked him at times and that he had acted in ways that ultimately could cause harm to others (A.R. at 404, 406). Dr. Guenther suspected that in the workplace he was someone who might struggle to tolerate even more minor stressors or constructive critiques or criticisms from co-workers or supervisors. He might even exhibit some behavioral extremes in the workplace (A.R. at 406). Dr. Guenther further found Plaintiff to be intellectually capable of following a variety of directions and instructions, but that he might exhibit some cognitive interference that might be most obvious when he was experiencing emotional distress (A.R. at 406).

Dr. Guenther noted that considering the presence of the underlying psychiatric symptoms and suspected maladaptive personality traits, the results of her evaluation were consistent with Plaintiff's allegations (A.R. at 406). She diagnosed an unspecified mood disorder without psychotic features, PTSD, provisional, unspecified personality disorder, provisional, and rule out impulse control disorder and alcohol and cannabis use disorder. Dr. Guenther described Plaintiff's prognosis as guarded and noted that Plaintiff's underlying personality disorder traits were long-standing (A.R. at 406).

      2.      Examining Consultant Christina N. Ryser, Ph.D.

On April 20, 2021, Dr. Ryser conducted a psychological evaluation that included interviewing Plaintiff, performing a mental status examination, and reviewing Plaintiff's treatment records from the Brien Center and CHP as well as an April 22, 2018 letter from Dr. Rudin and the Psychiatric/Psychological Impairment Questionnaires that Mr. Biernacki and Ms. Apkin completed in 2021 (A.R. at 919-28).  During Dr. Ryser's evaluation, Plaintiff described symptoms of depression, anxiety, PTSD, and intermittent explosive disorder.  As to PTSD, he related being abused by his brother during childhood and suffering the deaths of multiple close family members and friends.  He experienced recurrent, involuntary, intrusive, and distressing memories and dreams related to those traumatic events as well as psychological distress and marked physiological reactions when reminded of the trauma.  Plaintiff told Dr. Ryser that he began sleeping with knives after his friend died in 2016 then slept with a hatchet.  Plaintiff also described difficulty falling and staying asleep, irritability, angry outbursts, difficulty concentrating, reckless or self-destructive behavior, hypervigilance, and an exaggerated startle response (A.R. at 921-22).

As to the symptoms of intermittent explosive disorder, Plaintiff indicated that he would just flip.  Plaintiff described recurrent behavioral outbursts (representing a failure to control aggressive impulses), including verbal aggression and physical aggression, occurring at least three times a week for his entire life.  Plaintiff told Dr. Ryser that he was not good at dealing with bosses who did not know how to speak to their employees.  He would just walk out (A.R. at 922-23).  Dr. Ryser noted that Plaintiff's reported reactions were grossly disproportional to the triggering events and that the episodes were not limited to times when he was depressed or experiencing other mental symptoms or conditions.

In terms of daily activities, Plaintiff reported that he bathed or showered and changed his clothes twice a week. He washed the dishes but did not perform any other household chores, did not shop, and drove occasionally. He interacted only with his girlfriend and his dogs and avoided crowds. He spent most of his time playing video games to escape from his thoughts (A.R. at 923-24).

On mental status exam, Dr. Ryser noted that Plaintiff presented with a good attitude and was cooperative. His thought process was unremarkable. He appeared to be of average intelligence and exhibited a good vocabulary. His judgment and insight were fair. His thought content was notable for anger and irrational fears related to his trauma history. Plaintiff's facial expressions, tone of voice, and some psychomotor agitation indicated an anxious and irritable mood and a depressed affect (A.R. at 926-27). Dr. Ryser described Plaintiff's memory as somewhat limited. On a test of immediate memory, he recalled the three words he was asked to repeat. As to recent memory, he recalled two of three words after five minutes and recalled the third word with a prompt. His delayed and remote memory appeared to be intact (A.R. at 924, 927).

Dr. Ryser found that Plaintiff's ability to concentrate was restricted (A.R. at 927). He made six errors on Serial Sevens and required multiple pauses to complete the task. He was able to spell "world" backward and correctly calculate the answers to three of four simple math problems and all three of the math word problems that were presented orally. However, he required repetition and took more time than expected to produce his answers. Dr. Ryser opined that Plaintiff's difficulty with attention, concentration, and task completion would be exacerbated when he was required to focus for an extended time, perform multiple or challenging tasks, and when he experienced severe psychological symptoms (A.R. at 924, 927).

Dr. Ryser diagnosed PTSD, intermittent explosive disorder, major depressive disorder, recurrent, moderate, generalized anxiety disorder, and panic disorder (A.R. at 914, 927).  Dr. Ryser noted that Plaintiff was currently stable, but continued to experience problematic symptoms, such as low mood, intermittent irritability or anger, intrusive thoughts or flashbacks, nightmares, behavioral outbursts, excessive worry, intense anxiety episodes, and limited attention, concentration, and memory, which were exacerbated in times of stress (A.R. at 928).

As to Plaintiff's functional capacity, Dr. Ryser opined:

[He] appears challenged to consistently understand, remember, and apply information.  He appears limited with the ability to learn, recall, and use information to perform work activities.  While he may be able to follow some one-or two-step instructions to carry out a task, he is likely to struggle with detailed/complex instructions.  He could also be challenged to use reason and judgment to make work-related decisions, depending on his mental state at a given time.  He appears limited to concentrate, persist, and maintain pace, with regards to focusing attention on work activities, and staying on task at a sustained rate.  He is also likely to have difficulty with the ability to relate to and work with supervisors, co-workers, and the public on a consistent and independent basis. Overall his mental disorders would keep him from regulating his emotions, controlling his behavior, and/or maintaining his well-being in a work setting, and he is likely to struggle in dealing with normal pressures in a competitive work setting.

(A.R. at 928).

In connection with the evaluation, Dr. Ryser completed a Psychiatric/Psychological Impairment Questionnaire form concerning Plaintiff's mental impairments and ability to work. She indicated that Plaintiff's symptoms would consistently interfere with his ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and consistently be punctual, work in coordination with or near others without being distracted, complete a workday without interruptions from psychological symptoms, perform at a consistent pace without rest periods of unreasonable length or frequency, accept instructions and respond appropriately to criticism from

supervisors, get along with coworkers or peers without distracting them, maintain socially appropriate behavior, and respond appropriately to workplace changes.  In addition, Plaintiff's psychological symptoms would interfere with his ability to interact appropriately with the public for up to two-thirds of an eight-hour workday.  He would be absent from work more than three times per month (A.R. at 917, 918).

### 3.   Mr. Biernacki, Ms. Apkin, and Dr. Rudin

Mr. Biernacki completed a Psychiatric/Psychological Impairment Questionnaire in December 2016 and he and Ms. Apkin completed the forms in April 2017 and April 2021 (A.R. at 409-14, 428-33, 462-67, 468-73, 900-04, 907-11).  These forms generally mirrored Dr. Ryser's assessment of the degree to which Plaintiff's mental impairments would limit his ability to function in a work setting and were consistent with her opinion that his impairments would cause him to be absent from work more than three times per month (A.R. at 412, 465, 466, 471, 472, 903, 904, 910, 911).  Mr. Biernacki and Ms. Apkin diagnosed PTSD, major depressive disorder, and rule out intermittent explosive disorder (A.R. at 409, 462, 468, 900, 907).  Both noted Plaintiff's tendency to socially isolate, become angry, and engage in conflicts with others (A.R. at 464, 470, 902, 904, 909).

In April 2018, Dr. Rudin indicated that he had seen Plaintiff about every three months since June 2016 (A.R. at 512, 516).  Dr. Rudin opined that Plaintiff's anxiety would increase in the workplace and his mental health symptoms would interfere with his ability to attend and concentrate for one-third to two-thirds of an eight-hour workday (A.R. at 515).  According to Dr. Rudin, Plaintiff was unable to work due to severe anxiety, depression, and PTSD that were not controlled by the medication prescribed by the Brien Center (A.R. at 511, 512, 513, 516).

### 4.   The State Agency Consultant Opinions

On November 22, 2016, Kenneth Higgins, Ph.D., assessed Plaintiff's mental RFC based on a record review, including Dr. Guenther's report (A.R. at 68, 72).  Dr. Higgins opined that Plaintiff had no understanding and memory limitations but was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (A.R. at 73, 74).  He might have periodic disruption of sustained task completion due to affective interference, but his cognitive functioning was otherwise intact (A.R. at 74).  As to Plaintiff's ability to interact with others, Dr. Higgins found moderate limitations in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  Dr. Higgins found that Plaintiff had a history of mood dysregulation and interpersonal conflict, but also had the capacity for adequate self-control in structured settings.  Dr. Higgins further opined that Plaintiff was able to adapt to minor changes in routine (A.R. at 74).  Dr. Higgins determined that Plaintiff was not disabled (A.R. at 76).  The assessment of Lawrence Fieman, Ed.D., completed on March 22, 2017 on reconsideration, mirrored Dr. Higgins' assessment (A.R. at 89-98).

        D.      <u>The Administrative Hearing</u>

            1.      Plaintiff's Testimony

At the first hearing in May 2018, Plaintiff testified that his therapist had suggested that he stay with his significant other and he had been staying with her for about eighteen months (A.R. at 46-47).  He attempted to avoid other people as much as possible (A.R. at 47-48).  He stayed home because he feared that he would implode on someone if he went out (A.R. at 56-57).  Plaintiff indicated that he was not ready to work because of his mental condition, especially in a

job in which he would have access to items such as knives, frying pans, and hot oil (A.R. at 45-46).

In July 2021, Plaintiff testified that the main impairment that prevented him from working was uncontrollable crying spells that came on for no reason.  He also identified his inability to remember and intermittent explosive disorder that, he said, had been recently diagnosed.  Because of the diagnosis, he avoided interacting with people (A.R. at 630-31, 638-39).  He was taking mirtazapine, aripiprazole, gabapentin, and lorazepam for his mental health conditions and Benadryl to help with sleep (A.R. at 632, 633).  Plaintiff continued to avoid interpersonal interactions (A.R. at 639, 640).  He described an encounter with an unknown individual that made him angry.  Rather than engaging, Plaintiff drove away (A.R. at 639-40).  He said that he slept with knives and a hatchet after his friend died, but stopped after he pinned his girlfriend to the bed and waved the hatchet at an imagined assailant (A.R. at 631-32).  Plaintiff spent his days caring for his dogs and watching Netflix shows to avoid thoughts that made him cry (A.R. at 634, 635, 642).  Plaintiff could microwave a prepared meal.  Otherwise, he was not able to perform household chores or shop for more than one item (A.R. at 640-42).

2.      The Vocational Expert

The ALJ asked the V.E. to assume a person of Plaintiff's age, education, and work experience who could perform work at all exertional levels, who could understand, remember, and carry out simple and routine tasks throughout an ordinary workday and workweek with normal breaks on a sustained basis, who could not perform fast-paced conveyor belt or assembly line work, who could not interact with the general public but could tolerate occasional contact in the general vicinity, who could respond appropriately to occasional and superficial interaction with coworkers without teamwork or collaboration, who could respond appropriately to

occasional supervisory directions for simple work-related matters and to occasional supervisory

feedback in a non-confrontational manner, and who could adapt to and make simple, routine, and

occasional changes in the routine work setting (A.R. at 646-47).  The V.E. opined that such an

individual could perform Plaintiff's past work as a store laborer and the unskilled jobs of kitchen

helper, cleaner, and hand packager (A.R. at 646-48).  The V.E. testified that there were no jobs in

the national economy for an individual who was regularly absent more than once a month, off

task or off pace for two hours a day on a regular basis, and who was not able to accept

instructions or respond appropriately to criticism by supervisors (A.R. at 648-52).

     E.       The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirements on March 31, 2016

and had not engaged in substantial gainful activity after December 15, 2015, the alleged onset

date (A.R. at 575).  *See* 20 C.F.R. § 404.1571 *et seq.*  At the second step, the ALJ found that

Plaintiff had the severe impairments of PTSD, depressive disorder/bipolar disorder, anxiety with

panic features, OCD, personality disorder (intermittent explosive disorder), and polysubstance

dependence (alcohol, cocaine, and marijuana) (A.R. at 575).  *See* 20 C.F.R. 404.1520(c).  At step

three, she found that Plaintiff did not have an impairment or combination of impairments that

met or equaled the severity of one of the listed impairments in C.F.R. Part 404, Subpart P,

Appendix 1 (A.R. at 577).  Addressing the paragraph B criteria, the ALJ found that Plaintiff had

moderate limitations in his ability to understand, remember or apply information, interact with

others, concentrate, persist, or maintain pace and adapt or manage himself (A.R. at 577-78).

Before proceeding to steps four and five, the ALJ determined that Plaintiff had the RFC to

perform a full range of work at all exertional levels with the following nonexertional limitations:

> [He] can understand, remember and carry out simple and routine tasks throughout
> an ordinary workday and workweek with normal breaks on a sustained basis.

[He] cannot perform fast-paced conveyor belt or assembly line work.  [He] cannot interact with the general public, but can tolerate occasional contact in the general vicinity.  [He] can respond appropriately to occasional and superficial interaction with coworkers without teamwork or collaboration.  [He] can respond appropriately to occasional supervisory directions for simple work related matters. He can respond appropriately to occasional supervisory feedback for simple work related matters in a nonconfrontational manner.  [He] can adapt to simple, routine and occasional changes in the routine work setting [and] can make simple and occasional decisions in the routine work setting.

(A.R. at 579).  At step four, the ALJ found that Plaintiff was able to perform his past relevant work as a store laborer (A.R. at 595).  She further found that, considering Plaintiff's age, education, work experience, and RFC, and based on the V.E.'s testimony, Plaintiff could perform the unskilled jobs of kitchen helper, cleaner, and hand packager (A.R. at 595-96).  *See* 20 C.F.R. §§ 404.1569, 404.1569(a).  Consequently, the ALJ concluded that Plaintiff was not disabled (A.R. at 596-97).

IV.   ANALYSIS

A.   Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill*, 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court reviews questions of law *de novo, id.*, but "the ALJ's findings [of fact] shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion."  *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d

218, 222-23 (1st Cir. 1981)).  "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee*, 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

When Mr. C.'s case was before this court in 2020, the court remanded it to the SSA.  *See Casso v. Saul*, Case No. 3:19-cv-30036-KAR, 2020 WL 7024546 (D. Mass. Nov. 30. 2020).   At that point, the RFC crafted by the ALJ provided, in pertinent part, that, while Plaintiff could not tolerate contact with the general public, he could "respond appropriately to occasional and superficial directions and supervisory feedback in the routine work setting."  *Id.* at *7.  The hypothetical question the ALJ posed to the V.E. did not include "a social interaction limitation with regard to supervisors."  *Id.* at *11.  The court held that inclusion of such a limitation reasonably could have been expected to change the V.E.'s opinion about available jobs.  *See id.* The court directed that, on remand, the ALJ should fill in gaps in the medical records, reevaluate the RFC after considering any new evidence, reassess the record opinion evidence and Plaintiff's testimony, and explain the reconciliation of any conflicts between the opinion evidence, the RFC, and the final decision.  *See id.*  The Appeals Council remanded the case to the ALJ with instructions to conduct further proceedings consistent with the court's order, including offering

the claimant an opportunity for a further hearing, taking action to complete the administrative

record, and issuing a new decision (A.R. at 695).

The ALJ has complied with the orders of the Appeals Council and the court and,

following a further hearing, issued a second unfavorable decision.  Plaintiff contends that the

ALJ's resolution of the issues on remand is not supported by substantial evidence or in

compliance with the applicable regulations governing the weight to be assigned to opinion

evidence from treating care providers, and that the ALJ failed to reconcile conflicts between the

V.E.'s testimony and the DOT.  The Commissioner argues that there is substantial evidence in

the record supporting the ALJ's decision, that it is her responsibility to reconcile conflicts in the

evidence, and that there was no conflict between the V.E.'s testimony and the DOT.

      B.     <u>Weight Assigned to Opinion Evidence</u>

Under the regulations in effect when Plaintiff filed his claims, *see, e.g., Shatema B. v.*

*Saul*, 1:19-cv-00556-NT, 2020 WL 4383802, at *2 (D. Me. July 31, 2020) (stating that the

regulations in effect when the claim was filed govern the ALJ's evaluation of opinion evidence),

an ALJ is required to give controlling weight to the opinion of a so-called acceptable treating

medical source, including licensed physicians and licensed and certified psychologists, *see* SSR

06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006), "when that opinion is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is consistent with

substantial evidence in the record."  *Taylor v. Astrue*, 899 F. Supp. 2d 83, 87 (D. Mass. 2012)

(citing 20 C.F.R. § 416.927(c)(2)).  When an ALJ declined to give controlling weight to such an

opinion, the ALJ had to "consider the length, nature, and extent of the treatment relationship, the

opinion's supportability, and consistency with the record as a whole, the treating source's area of

specialization, and any other relevant factors to determine the opinion the weight deserves."  *Id.*

(citing 20 C.F.R. § 416.927(c)(2)-(6)).  An ALJ has discretion in assigning weight to the

opinions of a claimant's other treating health care providers depending on the facts of the case

but may not ignore these other medical sources or fail to explain the weight assigned to any such

opinions.  *See id.* at 88 (citing SSR 06-03p, 2006 WL 2329939, at *2-3).  "An ALJ has discretion

to weigh the opinion of a consultative examiner and attribute the appropriate weight based on

[her] review of the entire record."  *Guerra v. Comm'r of Soc. Sec.*, No. 1:16-CV-00991 (MAT),

2018 WL 3751292, at *7 (W.D.N.Y. Aug. 7, 2018).

For purposes of the mental health aspects of the RFC, the ALJ assigned partial weight to

Dr. Guenther's opinion, little weight to the opinions of Dr. Ryser, Mr. Biernacki, Ms. Apkin, and

Dr. Rudin, and some weight to the state agency non-examining consultant opinions (A.R. at 583-

93).

        1.      Dr. Guenther

The ALJ found that Dr. Guenther was an independent and unbiased source of information

whose findings that Plaintiff had a history of trauma with mood dysregulation and behavioral

issues, might struggle with minor stressors or constructive criticism from supervisors, and whose

emotional stress would interfere with cognitive functions were entitled to weight.  The ALJ

assigned partial weight to Dr. Guenther's opinions for two clearly expressed reasons.  First, Dr.

Guenther repeatedly noted the difficulty of obtaining complete and consistent information from

Plaintiff, so that, the ALJ found, Dr. Guenther's assessment of Plaintiff's limitations, which was

based on the information he provided, might not be fully consistent with his functional

capability.  Second, the ALJ noted, Dr. Guenther's opinions were more in the form of generalized

findings about Plaintiff's mental health impairments and did not set forth specific functional

limitations (A.R. at 585).  With these reservations and taking into account other information in

the administrative record, the ALJ nonetheless relied on Dr. Guenther's opinions as a basis for

including limitations on Plaintiff's interactions with the general public, co-workers, and

supervisors in the RFC (A.R. at 579) and in the hypothetical posed to the V.E. (A.R. at 646).

Plaintiff's contention that the ALJ rejected relevant "blunt" opinions voiced by Dr.

Guenther is not born out by the record (Dkt. No. 14 at 24-25). "It is perfectly acceptable for an

ALJ to discount a medical opinion due, in part, to its vagueness or ambiguity." *Alexander v.

Comm'r of Soc. Sec.*, Case # 19-CV-762-FPG, 2020 WL 5642184, at *5 (W.D.N.Y. Sept. 22,

2020) (citing *Guerra v. Saul*, 778 F. App'x 75, 77 (2d Cir. 2019) (mem.)). The ALJ was entitled

to take into account Dr. Guenther's repeatedly expressed reservations about her ability to elicit

factual information from Plaintiff that was responsive to her questions (A.R. at 395, 396, 398,

400, 404), the tentative form in which she expressed her opinions (A.R. at 404, 406), and the fact

that those opinions were of necessity based on incomplete and sometimes contradictory

information provided by Plaintiff (A.R. at 591). Dr. Guenther's opinions about Plaintiff's

functional limitations in the workplace were among those expressed in equivocal terms (A.R. at

406). Thus, for example, Dr. Guenther opined that she "*suspect[ed]* that in the workplace he is

someone who *may* struggle to tolerate even more minor stressors or even constructive critiques

or criticisms from coworkers or supervisors. He is someone who *may even* exhibit some

behavioral extremes, for instance behaviors in the workplace" (A.R. at 406) (emphasis added).

The ALJ, in the exercise of her discretion, gave weight to these opinions, "providing not only

quantitative restrictions that he was to have only occasional contact with supervisors and

coworkers of any stripe, but also qualitative ones prohibiting him from working in a teamwork or

collaborative environment." *Pressey v. Berryhill*, No. 2:16-cv-00425-JDL, 2017 WL 2731308,

at *3 (D. Me. June 25, 2017), *report and recommendation adopted*, 2017 WL 3711558 (D. Me.

Aug. 28, 2017). "Even assuming that reasonable minds might disagree with the ALJ's weighing

of the evidence and ultimate conclusion, these decisions were hers to make based on the record

before her." *Joyce v. Berryhill*, CIVIL ACTION NO. 16-11891-RGS, 2017 WL 4125254, at *11

(Sept. 18, 2017) (citing *Sexton v. Barnhart*, 247 F. Supp. 2d 15, 24 (D. Mass. 2003)).

            2.      Dr. Ryser

        Dr. Ryser, also a consultative examiner, opined that with treatment, Plaintiff was stable,

but continued to experience some problematic symptoms, those being low mood, intermittent

anger, intrusive thoughts, nightmares, behavioral outbursts, excessive worries, intense anxiety

episodes, and limited attention/concentration and memory, all of which appeared to be

exacerbated by stress. She opined that he appeared challenged to consistently understand,

remember, and apply information, limited in his ability to learn and recall information and to

concentrate and persist in work activities, and was likely to have difficulty in relating to and

working with supervisors, co-workers, and the general public on a consistent and independent

basis (A.R. at 928).

        The ALJ supplied good reasons for attributing little weight to Dr. Ryser's opinion,

observing that the expressed limits on understanding, memory, concentration, and persistence

and ability to adapt were not supported by any cognitive testing and were inconsistent with

substantial evidence in the longitudinal record documenting intact cognition (even, in 2020,

above average intelligence), no significant attention or concentration issues, and no

hospitalizations or inpatient treatment (A.R. at 587, 947). *See, e.g., Lumpkin v. Berryhill*, No.

2:17-cv-00081-NT, 2018 WL 640229, at *3 (D. Me. Jan. 31, 2018) *report and recommendation

adopted,* 2018 WL 1548689 (D. Me. Mar. 29, 2018) (stating that the ALJ's decision to accord

little weight to parts of a consultant's opinion was justified where the opinion was inconsistent

with other substantial evidence in the record and was based in large part of the claimant's subjective allegations); *Pressley v. Berryhill*, CIVIL ACTION NO 16-40050-TSH, 2017 WL 5760915, at \*14 (D. Mass. Sept. 18, 2017) (agreeing with the ALJ's decision to discount the opinions of a treating physician about the claimant's mental health impairments when – as in this case – the record lacked evidence of frequent visits to the emergency room due to psychiatric symptoms or extended psychiatric hospitalizations) (citing *Wysocki v. Colvin*, Civil Action No. 13-30188-MGM, 2014 WL 6485887, at \*3 (D. Mass. Nov. 19, 2014)).

The ALJ agreed with Dr. Ryser that Plaintiff had limitations in social interactions but rejected the assessment of marked limitations, observing that Plaintiff maintained relationships with a girlfriend and a roommate and interacted well with care providers without incident (A.R. at 593).[6] This record "demonstrates the ability, even if limited, to connect and function with others." *Deane v. Colvin*, 247 F. Supp. 3d 152, 169 (D. Mass. 2017); *see also Wysocki*, 2014 WL 6485887, at \*3. The ALJ acted within her discretion in affording Dr. Ryser's opinion little weight. *See Guerra*, 2018 WL 3751292, at \*7.

3. Mr. Biernacki and Ms. Apkin

Mr. Biernacki[7] and Ms. Apkin opined that Plaintiff's symptoms would continually interfere with his ability to accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them, maintain socially

---

[6] The ALJ's finding that Plaintiff had been charged with assault and battery appears to be a misreading of the record (*see, e.g.,* A.R. at 587). The note of Plaintiff's March 27, 2019 visit to the Brien Center describes a fight between Plaintiff's friends Tommy and Johnny that led to Tommy's arrest for assault and battery by means of a dangerous weapon (A.R. at 934).

[7] The court rejects Plaintiff's assertion that Mr. Biernacki's December 2016 opinion should be given controlling weight because Dr. Rudin signed it. The form was signed by "Randall, M.D." on January 20, 2017 (A.R. at 413). Dr. Randall's name does not appear elsewhere in the record.

appropriate behavior, and appear for work as required (A.R. at 903, 910). Under the regulations in effect when the claim was filed, Mr. Biernacki and Ms. Apkin were other medical sources whose opinions were not entitled to controlling weight. The ALJ was, however, still required to adequately explain her reasons for assigning these opinions little weight. *See Taylor*, 899 F. Supp. 2d at 88-89. The ALJ has done so.

First, her decision acknowledges the nature and extent of the relationships these care providers had with Plaintiff, describing the treatment history in considerable detail (A.R. at 581-82, 587-591). *See Bourinot v. Colvin*, 95 F. Supp. 3d 161, 177 (D. Mass. 2015) (relying on the ALJ's extended discussion of the care provider's treatment notes as evidence that the ALJ considered the extent to which the opinions were supported by relevant evidence and the consistency of the opinions with the record as a whole). The ALJ acknowledged Plaintiff's history of anger. She accorded the opinions of Mr. Biernacki and Ms. Apkin little weight based on their inconsistency with Dr. Guenther's assessment of Plaintiff's limitations and Mr. Biernacki's treatment records; the evidence concerning Plaintiff's social relationships; and the longitudinal record of mental status exams and improvement of anger management with treatment (A.R. at 587, 588-89). Because the ALJ also relied on most of these factors in her assessment of Dr. Ryser's opinion, the ALJ's treatment of these factors is addressed above.

In evaluating the opinions of Mr. Biernacki and Ms. Apkin, the ALJ also relied on evidence of Plaintiff's treatment history. An ALJ may consider an individual's treatment history, including compliance with prescribed treatment, when considering whether symptoms affect a claimant's ability to perform work-related activities to the degree asserted by a claimant. *See, e.g., Silva v. US Soc. Sec. Admin., Acting Comm'r*, Case No. 17-cv-368-PB, 2018 WL 4043146, at *7 (D.N.H. Aug. 3, 2018) (citing SSR 16-3P, 2016 WL 1119029, at *8 (Mar. 16, 2016)). The

ALJ did not err in noting that the record included treatment notes that reflected improvement, with treatment, in Plaintiff's ability to manage his anger, although this was not always the case (A.R. at 422, 446, 447, 934, 937, 941, 946, 991).  The ALJ also accurately noted that the record showed that Plaintiff frequently failed to follow prescribed treatment (medication and therapy) (A.R. at 446, 491, 493, 934, 954, 952, 956, 961, 966, 975, 982, 974, 984, 991), a factor on which she was entitled to rely in assessing the extent of Plaintiff's limitations.  Before relying on a claimant's failure to comply with prescribed treatment, an ALJ must consider "possible reasons [the claimant] may not comply with treatment or seek treatment consistent with the degree of his or her complaints."  SSR 16-3P, 2016 WL 1119029 at *8-9.  Here, even if, as the ALJ acknowledged, concern about the effects of the prescribed medication might excuse some of Plaintiff's treatment failures (A.R. at 589), there is nothing in the record to suggest that he was unable to appreciate his need for treatment for mental health issues, and no apparent excuse for failing to engage in counseling.

4.      Dr. Rudin

The ALJ declined to assign controlling weight to Dr. Rudin's opinion that Plaintiff was disabled notwithstanding Dr. Rudin's status as a treating source based on substantial evidence in the record.  *See Arroyo v. Sec'y of Health & Human Servs.,* 932 F.2d 82, 89 (1st Cir. 1991); 20 C.F.R. § 404.1502(a); SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  The ALJ correctly noted that Dr. Rudin's opinion of Plaintiff's mental status, which relied on physical impairments that the ALJ found were not severe impairments at step two (A.R. at 575), was not well-supported (A.R. at 512-16, 592).  Moreover, the decision as to whether Plaintiff is disabled is reserved to the Commissioner.  *See, e.g., Ferguson v. Berryhill*, Civil Action No. 18-11239-DJC, 2020 WL 210821, at *7 (D. Mass. Jan. 14, 2020).

5.      The State Agency Consultants

SSA regulations that came into effect before Plaintiff filed his DIB claim require SSA

adjudicators to "consider and articulate how [the ALJ] considered [prior administrative medical

findings] in the decision."  SSR 17-2P, 2017 WL 3928306, at *3 (Mar. 27, 2017).  Even before

that date, case law provided that "'the amount of weight that can properly be given the

conclusions of non-testifying, non-examining physicians will vary with the circumstances,

including the nature of the illness and the information provided the expert.'"  *Bourinot*, 95 F.

Supp. 3d at 179 (quoting *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994)) (internal quotations

omitted).  Here, complying with the directive in SSR 17-2P that she explain her consideration of

the prior administrative medical opinions, the ALJ assigned some weight to the opinions of the

non-examining state agency consultants who reviewed Plaintiff's 2016 treatment records (A.R. at

67-76, 89-98, 593).  On the most critical point, which is Plaintiff's ability to function in the

workplace notwithstanding limitations on his ability to interact with others, the state agency

consultants reviewed Dr. Guenther's evaluation and recognized Plaintiff's history of mood

dysregulation and interpersonal conflict but concluded that he had an adequate capacity for self-

control in structured settings and opined that his capacity for workplace interaction was

moderately limited (A.R. at 74, 96).  The ALJ found these moderate limitations consistent with

the record as a whole where the record showed that Plaintiff had improved his anger

management through treatment (A.R. at 593), and gave these opinions some weight as support

for the limitations in the RFC on interactions with other individuals, including supervisors, in the

workplace.  The ALJ also accepted as consistent with the administrative record as a whole the

state agency reviewers' RFC finding of moderate limitations for concentrating, persisting or

maintaining pace.  She concluded that the record as a whole, much of which was compiled after

the state agency reviews, supported greater limitations than had been assigned in the state agency reviews in the areas of understanding, remembering, and applying information, and adapting or managing oneself (A.R. at 599).  The ALJ reviewed the state agency reviews for consistency with the record that was subsequently developed, did not blindly accept the state agency reviewers' RFC opinions, and adequately explained her reasons for assigning the weight she assigned to the opinions.  *See Maillet v. Colvin*, Civil Action No. 15-13365-MGM, 2016 WL 3676142, at *5 (July 7, 2016) (discussing the ALJ's assignment of weight to the opinions of non-examining state agency sources when the state agency reviewers gave their opinions about the claimant's functional capacities well before the full record was compiled).  Plaintiff's assertion that the ALJ gave the greatest weight to these opinions is not accurate (Dkt. No. 14 at 25).  Fairly read, the ALJ's decision assigns the greatest weight to Dr. Guenther's opinion, which the ALJ discussed at far greater length than she did the opinions of the state agency reviewers (A.R. at 583-85, 592-93).  Moreover, "[w]hile the review happened a significant amount of time before the hearing, Plaintiff does not cite to later additions in the record which contradict the consultants' findings."  *Id.*  (Dkt. No. 14 at 25-26).  The ALJ did not err in assigning some weight to the state agency reviewers, who are understood to be highly qualified medical sources with expertise in the evaluation of medical issues in disability claims.  *See* SSR 17-2P, 2017 WL 3928306, at *3.

        C.     <u>Evaluation of Plaintiff's Testimony</u>

"Once it is found that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate evidence of the intensity and persistence of the symptoms, including statements from the claimant." *Bourinot*, 95 F. Supp. 3d at 180 (citing 20 C.F.R. §§ 404.1529(c)(1); 416.929(c)(1)).  The

claimant's subjective claims about symptoms must be considered in the context of the evidence as a whole, including objective medical evidence.  *Id.* (citing 20 C.F.R. §§ 404.1529(a), (c); 416.929(a), (c)).  "The ALJ's credibility determination 'is entitled to substantial deference, especially when supported by specific findings.'"  *Id.* (quoting *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987)).

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that his statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record (A.R. at 580).  Based on her review of the medical records, she rejected Plaintiff's claims that his medical conditions, none of which she found to be severe impairments, limited his ability to engage in a full range of exertional work activities (A.R. at 593).  She found that his mental health impairments gave rise to limitations in his ability to work with others and that his history of trauma and the resulting emotional distress would also limit him functionally (A.R. at 594).  She found that Plaintiff had a greater ability to engage in work-related activities than he claimed based on the evidence of comparatively conservative treatment that did not include hospital or inpatient treatment for his mental health impairments, periodic improvements with anger management from treatment, and many normal findings on mental health status examinations, including normal cognition, thought processes and perception, intelligence, mood, and affect.  The ALJ noted that, while Plaintiff alleged problems with his memory and concentration, there were times when his memory and concentration were assessed as within normal limits.  The ALJ also relied on the record of Plaintiff's activities, including travel, social relationships, and daily activities.

Plaintiff argues, in cursory fashion, that the ALJ's evaluation of Plaintiff's subjective statements of disabling limitations is not supported by substantial evidence for the reasons "previously detailed in discussing the medical opinion evidence," and observes that Plaintiff's allegations could not be rejected solely because those statements were not supported by objective medical evidence (Dkt. No. 14 at 29).  Addressing the latter point, as is set forth above, the decision lays out many reasons why the ALJ did not find Plaintiff wholly persuasive as to the extent of his functional limitations.  It was appropriate for her to consider whether there was supporting objective medical evidence, and she did not reject Plaintiff's claim that he was unable to work based solely on a lack of supporting objective medical evidence.  As to Plaintiff's first point, "the resolution of conflicts in the evidence and the determination of credibility are for the Commissioner, not for doctors or the courts." *Sexton*, 247 F. Supp. 2d at 17.  "[E]ven if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion.'" *Id.* (second alteration in original) (quoting *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted)).  This principle applies in this case.  The court is obliged to decline the Plaintiff's invitation to the court to second guess the ALJ's resolution of conflicts in the evidence.

      D.     <u>The Vocational Expert's Testimony</u>

Finally, Plaintiff contends that the ALJ erred by failing to reconcile apparent conflicts between the V.E.'s testimony and the description of jobs found in the DOT that the V.E. testified could be performed by someone with the restrictions described in the ALJ's hypothetical question.  Plaintiff contends that the jobs identified by the V.E. had reasoning levels of 2 which

were not consistent with the restrictions in the RFC to jobs limited to those involving simple and routine tasks that did not require fast paced work or work on a conveyer belt (Dkt. No. 14 at 29-31).

> The DOT assigns a GED reasoning level to listed occupations, ranging from Level 1 (the lowest level) to Level 6 (the highest).  U.S. Dep't of Labor, Dictionary of Occupational Titles, App. C (4th ed. 1991).  Level 1 requires the ability to "carry out simple one- or two-step instructions" and "deal with standardized situations with occasional or no variables in or from these situations encountered on the job."  *Id.*  Level 2 requires the ability to "carry our detailed but uninvolved written or oral instructions" and "deal with problems involving a few concrete variables in or from standardized situations."

*Couch v. Berryhill*, Civil Action No. 18-11023-FDS, 2019 WL 2340956, at *5 (D. Mass. June 3, 2019).

The jobs identified by the V.E. in the instant case all require level 2 reasoning.  *See* DOT No. 922.687-058, 1991 WL 688132 (1991) (store laborer); DOT No. 318.687-010, 1991 WL 672755 (1991) (kitchen helper); DOT No. 323.687-010, 1991 WL 672782 (1991) (hospital cleaner); DOT No. 920.587-018, 1991 WL 687916 (1991) (hand packager).[8]  Plaintiff "has not demonstrated a conflict between a limitation to simple and unskilled work and reasoning level 2 jobs.  'Courts regularly have found that DOT reasoning levels 2 and 3 are consistent with an RFC limitation to simple and unskilled tasks.'"  *Couch*, 2019 WL 2340956, at *5 (quoting *Hargrow v. Colvin*, Civil Action No. 13-10170-DJC, 2014 WL 1153782, at *17 (D. Mass. Mar. 18, 2014)

---

[8] The V.E. did not specify that the position referred to was a cleaner in a hospital.  In addition, the position of hand packager, as described in the DOT, may, but does not in most cases, require work on a conveyer belt.  The RFC in the ALJ's decision and the hypothetical question posed to the V.E. provided that Plaintiff could not perform fast-paced work on a conveyer belt (A.R. at 585, 652).  Plaintiff did not identify these minor variances and, therefore, has not argued that they warrant remand, and, in the court's view, they do not.  *See Tetrault v. Astrue*, Civ. Action No. 09cv11390-NG, 2011 WL 613701, at *6 (D. Mass. Feb. 11, 2011) (where some of the jobs in the occupational category identified by the V.E. fit a claimant's RFC even if others do not, the V.E.'s testimony that a hypothetical claimant could perform jobs in the category identified is substantial evidence supporting an ALJ's step 5 finding).

(collecting additional cases)); *see also Aho v. Comm'r of Soc. Sec. Admin*, Civil Action No. 10-40052-FDS, 2011 WL 3511518, at *9 (D. Mass. Aug. 10, 2011) (noting that three circuit courts had found that a restriction to simple, repetitive tasks was compatible with the ability to perform jobs with a level 2 reasoning requirement).  As to the question of pace (i.e., no conveyer belt or assembly line work), the DOT descriptions of the four positions identified by the V.E. "are silent with respect to the pace at which the jobs must be performed . . . ."  *Szumylo v. Astrue*, 815 F. Supp. 2d 434, 440-41 (D. Mass. 2011).  The restriction against work involving a conveyer belt or production line does not create an actual or apparent conflict between the V.E.'s evidence and the DOT job descriptions for the positions identified by the V.E.  "The ALJ did not run afoul of her obligations under SSR 00-4p when there was no apparent inconsistency or conflict between the vocational expert's evidence and the DOT to be resolved."  *Id.*  If a latent conflict exists – and Plaintiff has not established that any such latent conflict exists – an ALJ need not resolve it if the conflict is not identified at the hearing.  *Id.* (quoting *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) (unpublished).  Here, as in the *Szumylo* case, the V.E.'s "testimony provided substantial evidence upon which the ALJ could rely in finding that there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform."  *Id.*

V.     CONCLUSION

For the above-stated reasons, Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 13) is DENIED and the Commissioner's motion to affirm her decision (Dkt. No. 19) is GRANTED.  The Clerk is directed to close the case on this court's docket.

It is so ordered.

Date:    January 30, 2024                 /s/ Katherine A. Robertson
                                               KATHERINE A. ROBERTSON
                                               United States Magistrate Judge